IN THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| NATURAL DYNAMICS, LLC | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. <u>1:12-CV-964</u> |
| | § | |
| CONQUEST INTERNATIONAL, INC. and | § | |
| PETER GILLHAM, | § | |
| *Defendants.* | | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Natural Dynamics, LLC ("Plaintiff") files this Original Complaint against Conquest International, Inc. and Peter Gillham ("Defendants"), and for cause of action respectfully submits the following:

## I. PARTIES

1.      Plaintiff is a Texas limited liability company based in Travis County, Texas.

2.      Defendant Conquest International, Inc. is a Nevada corporation with its principal office located at 101 Convention Center Drive, Suite 700, Las Vegas, Nevada 89109. Conquest may be served with process by personal service on the Texas Secretary of State, Statutory Documents Section, Citations Unit, 1019 Brazos, Austin, Texas 78701, or by mail at P.O. Box 12079, Capitol Station, Austin, Texas 78711-2079. The Texas Secretary of State is the agent for service of process on Conquest because this defendant does not maintain a regular place of business in Texas and does not have a designated agent for service of process in Texas.

3.     Defendant Peter Gillham is an individual residing in California and may be served at 4867 Fountain Avenue, Los Angeles, California 90029.

## II. JURISDICTION AND VENUE

4.     This court has subject matter jurisdiction of this dispute pursuant to 28 U.S.C. §1332(a)(l) since the amount in controversy is over $75,000.00 and there is diversity of citizenship between the parties.   In addition, pursuant to 28 U.S.C. § 2201(a) and 28 U.S.C. § 1441, this Court has jurisdiction to render judgment and declare the rights of the parties under the contracts that are the subject of this lawsuit.

5.     Venue is proper in the Austin Division of the Western District of Texas pursuant to 28 U.S.C. §1391(a)(2), as a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## III. STATEMENT OF FACTS

6.     Peter Gillham ("Gillham") is the founder and President of Defendant Conquest International, Inc. ("Conquest").   Gillham started Conquest in 1994 and developed nutritional supplements for sale.

7.     Upon information and belief, Gillham was an objector to federal income taxation and refused to file tax returns or pay taxes for the years 1988-1994.  In 2006, an agent of the Internal Revenue Service contacted Conquest, after multiple attempts to reach Gillham.  When Gillham refused to meet with the agent, the agent informed the company that she intended to file an alter ego nomination, seeking recovery from Conquest of approximately $2 million in back taxes and penalties owed personally by Gillham.  At this same time, Conquest was financially mismanaged and was on the verge of bankruptcy.  Vendors began to cut the company off, cash reserves were used to pay payroll, and the situation became desperate with the IRS looming.

8.     Gillham and the company's Executive Director at that time approached Justin Farmer ("Farmer"), who was Conquest's Vice President of Administration, and asked him to meet with the IRS and keep them at bay since Gillham himself refused to meet with the IRS agent.  Farmer met with the IRS agent, and the company then hired Steven Oliver, a CPA, to file back taxes for Gillham, and later Jim Jackson ("Jackson"), an attorney and CPA, to fight the IRS's charges of tax fraud and penalties.  Farmer successfully negotiated a settlement with the IRS based on Gillham's then salary of $250,000 per year due to no other income being present in the company for settlement, which allowed the company to survive.  Farmer at that time fully realized the dire financial situation at Conquest.

9.     In late 2006, Gillham and the company's Executive Director began discussing the possibility of selling Conquest and had Farmer meet with Sunbelt Business Brokers to discuss selling Conquest.

10.     Gillham did not manage or participate in the company on a day-to-day basis during this time period.  He came into the office weekly, usually during the late evening when no other staff were present, to sign checks.

11.     Farmer approached Gillham about Conquest's financial situation by leaving financial statements in Gillham's office, hoping Gillham would intervene.  He also sent Gillham regular reports of claims of sexual harassment being asserted against the Executive Director.  It became apparent that Gillham did not appreciate the dire straits Conquest was in financially.  In addition, the company was being threatened with litigation regarding allegations of sexual harassment by the Executive Director, which Gillham ignored.  Knowing the financial situation of the company, the rampant allegations of sexual harassment against the Executive Director, and Gillham's lack of action, in 2007, Farmer, Ken Whitman, and Susan Whitman requested that Gillham remove

3

the Executive Director from her position or they would leave the company. Ken and Susan Whitman ran a profitable and award-winning marketing, advertising, and design firm. In 2002, Conquest became their client, and they actively marketed the Natural Vitality brand of products. The Whitmans' responsibilities increased at Conquest, and within two years they were put in charge of all marketing and advertising for the company. Gillham conceded to the Executive Director's removal and appointed Ken Whitman, Susan Whitman, and Justin Farmer to Conquest's Board of Directors. The Whitmans and Farmer were given the task of resurrecting Conquest financially. Famer was appointed Executive Director.

12.     Farmer and the Whitmans, beginning in August 2007, cut salaries for all executives and staff (but did not cut the salary of Gillham), restructured the company to increase product penetration, lifted previous restrictions for co-operative marketing with retailers, and provided severance packages for non-essential staff. By the end of 2007, Conquest posted its highest profit year-to-date, nearly doubling its profits from the prior year.

13.     As the company's financial performance improved, Gillham expressed his further desire to sell the company. He asked Farmer to arrange meetings with private equity groups, and Farmer again met with Sunbelt, but nothing came of the meeting. Gillham then asked Farmer to commission a valuation of the company.

14.     The idea of a management buyout of Conquest surfaced. Gillham was immediately interested.

15.     At Gillham's request, Farmer acted as the point person in negotiations between Gillham, on the one hand, and Farmer and the Whitmans, on the other hand. Farmer suggested to Gillham that Gillham and Conquest retain separate counsel for the negotiations, and Farmer sent proposed contracts to Gillham and Conquest's counsel for review. Defendants, however, chose instead to

proceed with one lawyer for all parties, Rosser Cole, and executed a conflict of interest waiver, authorizing Cole to represent both sides in the transaction.

16.     Over the following eight months an extensive number of meetings and conference calls took place between the parties to negotiate the sale of Conquest's assets to a new company named Natural Dynamics, which was comprised of Farmer and the Whitmans as principals. Gillham's terms were highly favorable to him, affording him substantially more income potential from the sale than he would have been able to realize from private equity investors based on Conquest's commissioned valuation of $4.1 million.

17.     Gillham rarely uses email or faxes sensitive documents.   As a result, most of the negotiations took place in person and with Gillham occasionally notating on the agreements directly, in his own hand, any proposed questions or changes.   Negotiations were constant and continued until all agreements were signed.

18.     In June 2008, after two hours of contract review and related discussions at the office of Rosser Cole, the parties executed the following agreements, resulting in Natural Dynamics' purchase of the assets of Conquest effective June 24, 2008:  (a) an Agreement for Purchase and Sale of Business Assets ("Agreement for Purchase"); (b) a related note and security agreement; (c) a Contract for Services wherein Gillham had continuing obligations to Natural Dynamics to not compete in exchange for regular, periodic payments; and (d) other, related agreements, including a marketing agreement.

19.     (a) Under the Agreement for Purchase, Gillham would be paid $3.8 million for Conquest's assets and retain Conquest's retail stores and important international clientele. The payment was secured by a note and security agreement, with an interest rate of 5% per annum set for the duration of the note.  This interest rate provided Gillham additional revenue of $180,000

in interest income per year. The Agreement for Purchase and the related note allowed Gillham to retain approximately $550,000 in annual net earnings from Conquest, while Natural Dynamics paid a minimum of $525,000 in interest and principal payments per year, totaling in $1,075,000 in annual revenues to Gillham. The buyers provided Gillham with personal guarantees and a UCC-1 against Natural Dynamics, should they not be able to generate the required income to meet Gillham's revenue requirements.

 (b) Under the Contract for Services, Gillham would be paid $380,000 per year for life, which included at Gillham's demand over $10,000 per month in expenses, so long as he complied with the Contract for Services' terms and neither side terminated the agreement.

(c) Under the marketing agreement, Natural Dynamics was to pay Gillham 5% of the gross profits of the company starting in 2018 and continuing for the remainder of his life.

(d) Under these agreements Gillham stood to make over $1,400,000 annually and $14 million if he lived just 10 years and significant additional income if he lived past 90 years old. In fact these arrangements would generously pay Gillham over three times the valuation of the company without any obligation from him except to respect the terms of the agreements and to manage the revenue sources retained by Conquest under the Agreement for Purchase.  At the time of sale, he was 80 years old.

20.     Before the effective date of the sale, in September 2008, Gillham asked Farmer to go to Conquest's Clearwater, Florida store to obtain a severance and general release from a young employee there who claimed Gillham made unwanted sexual advances.  This was the fifth case of threatened sexual harassment against Gillham or an immediate subordinate of Gillham in less than two years.

21.     In October 2008, Conquest's remaining assets were turned over to the complete control of Gillham.  Gillham almost immediately spent nearly all of the cash in Conquest's accounts, spending over $254,000, not only endangering Conquest but also causing Conquest to lack the income to support Gillham's ongoing obligations to pay back the IRS in order to avoid fraud charges, penalties, and the immediate resurrection of the IRS collection efforts for the full amount owed.

22.     To assist Gillham, Natural Dynamics amended its tax return to assume Gillham's tax liability and then paid for Gillham's unpaid tax obligations under the understanding that the amount Natural Dynamics paid would be deducted from the amount owed on the note related to the Agreement for Purchase.  This agreement was memorialized through a new Contract for Services with an effective date of January 1, 2009.

23.     Thereafter, Defendants' breaches of the parties' contracts began to surface.  Defendants were able to purchase Natural Dynamics' products at roughly cost under the Agreement for Purchase and to sell those products in his stores.  Gillham, however, failed to pay for the products, unfairly saddling Natural Dynamics with not only having to generate high revenue to pay for its obligations to Gillham, but also providing product for his stores without payment.

24.     By the end of 2010, Gillham still refused to pay for product purchased by Gillham's stores, forcing Natural Dynamics to cancel credit terms given to Gillham's stores due to non-payment.  During 2010, it became clear that Gillham was now marketing vitamins and Natural Dynamics' products to Natural Dynamics' customers in a direct attempt to compete with Natural Dynamics and lure away its customers.  Gillham made attempts to acquire Natural Dynamics' national and successful international clients.  In addition, Gillham began putting his name on bottles of supplements, in clear violation of the agreements he signed that precluded his

marketing products that would in any way be confused with the trademarks owned by Natural Dynamics. Attempts by Farmer to handle this issue with Conquest were unsuccessful.

25.     Gillham also started blogging with his photograph and name on the website VITES.COM. The website was owned by Natural Dynamics and given to Gillham with specific requirements to ensure that there be nothing on the site that could cause confusion with the trademarks owned by Natural Dynamics. Gillham made statements on the site that directly violated federal law and regulatory requirements, further endangering the Natural Vitality brand, which was now owned by Natural Dynamics. To distance the company and its trademarks from Gillham, Natural Dynamics ceased using Peter Gillham's likeness and name on its products.

26.     The key product Natural Dynamics purchased in the sale was *Natural Calm*, a product formulated by Gillham originally. In August 2011, Natural Dynamics discovered that a new product had been developed to compete with *Natural Calm*, using the same bottle, a similar name, and language from Natural Dynamics' copyrighted promotional materials word for word with minor additions. The company's name was Outback Naturals. This product was traced, however, directly to Conquest and Gillham, as well as Gillham's daughter, Janice Grady. Natural Dynamics questioned Gillham concerning this product, only to be met with hostile resistance by Gillham. Repeated requests for an in-person meeting required under the Agreement for Purchase and the Contract for Services were refused by Gillham.

27.     In response to Natural Dynamics' questioning of Gillham concerning his obvious competition with them in direct contravention of his Contract for Services, Gillham terminated the Contract for Services, declaring it "null and void." Gillham then demanded a new Contract for Services for more money and without any non-competition obligations. Natural Dynamics accepted Gillham's cancellation of the Contract for Services but refused to enter a new one.

28.     Natural Dynamics then arranged to pay the balance of its note to Conquest/Gillham under the Agreement for Purchase.  Natural Dynamics paid this amount on August 3, 2012, in effect ending all obligations of Natural Dynamics under the Agreement for Purchase and accompanying security agreement.

29.     Since that time, Gillham and his attorney asked for substantial funds and records from Natural Dynamics, now claiming that the Agreement for Purchase was not negotiated in good faith and that the note was not fully paid off.  They also claim that Gillham's termination of the Contract for Services was ineffective.  Finally, they demand production of Natural Dynamics' financial records and customer lists in its Quickbooks files.  It is clear that Gillham is still attempting to compete against Natural Dynamics.  Gillham's request for further documentation from Natural Dynamics is a transparent attempt to obtain financial and customer data to further his efforts.  Conquest's staff and even Gillham's assistant have recently attempted to procure confidential product information relating to the current production of *Natural Calm* from Natural Dynamics' production staff.

30.     Gillham has a history of broken written and verbal agreements.  He has broken every active agreement he made with Natural Dynamics.  Having sold his ailing company to a group who successfully expanded it and, in the process, gained a reputation for leadership in the industry and made it profitable far in excess of the company's valuation, it is clear Gillham suffers from a severe case of seller's remorse.  Gillham is now asserting a fictional story designed to exonerate himself from his contractual breaches and to assert ownership of what he has already sold and for which he has already been paid.  He will not leave Natural Dynamics alone until the issues between the parties are decided in court.

## IV.    CAUSES OF ACTION

**A.    Declaratory Judgment**

31.    Plaintiff repeats the preceding paragraphs of this Complaint here by reference, as if repeated fully.

32.    Plaintiff seeks a declaratory judgment from the court and respectfully requests that the Court declare the following:

a.    That the Agreement for Purchase is valid and enforceable;

b.    That the Defendants breached the terms of the Agreement for Purchase;

c.    That Plaintiff fully paid off the note provided to Defendants as part of the Agreement for Purchase;

d.    That Plaintiff has no further obligations to Defendants under the Agreement for Purchase;

e.    That Plaintiff and Gillham entered a binding Contract for Services;

f.    That Gillham breached the Contract for Services by competing against Plaintiff and by developing products using Plaintiff's trade secrets, trademarks, and copyrighted material;

g.    That Gillham effectively terminated all obligations under the Contract for Services by declaring it null and void in writing; and

h.    That Plaintiff has no further obligations to Gillham under the Contract for Services.

33.    A declaratory judgment on these matters is necessary because of the existing dispute between the parties concerning each of these issues.  These issues are ripe for adjudication and are within the Court's jurisdiction.

**B.      Breach of Contract**

34.      Plaintiff repeats the preceding paragraphs of this Complaint here by reference, as if repeated fully.

35.      Plaintiff also seeks monetary damages against Defendants for violation of the Agreement for Purchase and the Contract for Services.

36.      Gillham took part in direct competition with Plaintiff, in violation of the Agreement for Purchase and the Contract for Services.  The key product Natural Dynamics purchased in the sale was *Natural Calm*, a product formulated by Gillham originally.  In August 2011, Natural Dynamics discovered that a new product had been developed to compete with *Natural Calm*, using the same bottle, a similar name, and copying copyrighted promotional materials word for word with minor additions on a website.  The company's name was Outback Naturals.  This product was traced, however, directly to Conquest and Gillham, as well as Gillham's daughter, Janice Grady.   Gillham started a company that competed directly with Natural Dynamics, infringed upon Natural Dynamics' trademarks, and plagiarized Natural Dynamics' copyrighted promotional materials word-for-word on the Outback Naturals website.  These products were openly promoted with Gillham's approval, including the Australian references in the company, which played upon Gillham's well-known (in the industry) Australian heritage.

37.      Gillham used the formula he had for *Natural Calm*, the same bottle, and copyrighted promotional materials.  As a result of this breach of the Contract for Services, Plaintiff suffered damages, including lost revenues and profits.

38.      Gillham also breached the parties' contracts by blogging and publishing opinions that jeopardized Plaintiff by violating federal law and regulations.  Finally, Gillham took part in direct competition against Plaintiff, in violation of the agreements.

39.     These actions by Gillham caused direct harm to Plaintiff, for which Plaintiff now seeks monetary damages in the form of lost revenue, actual and consequential damages, as well as recovery of attorneys' fees under Chapter 38 of the Texas Civil Practice and Remedies Code.

## V.     DAMAGES AND PRAYER

40.     Plaintiff seeks all actual and consequential damages to which it is entitled.

41.     Plaintiff seeks recovery of its attorneys' fees under Chapter 38 of the Texas Civil Practice and Remedies Code, and 28 U.S.C. § 2202, as well as prejudgment interest, post-judgment interest, and court costs.

42.     Plaintiffs also seek to recover all other remedies, both in law and in equity, to which they may be entitled.

43.     Plaintiff prays for judgment against Defendants for damages, attorneys' fees, pre-judgment interest, post-judgment interest, injunctive relief, taxable court costs and disbursements herein, and any further relief the Court deems just.

Respectfully submitted,

THE FIELD LAW FIRM, PLLC

By: /.s/ Scott King Field
Scott King Field
State Bar ID No. 00793725
Kent E. Wymore IV
State Bar No. 24075315
5910 Courtyard Drive, Suite 355
Austin, Texas 78731
(512) 346-3600
(866) 271-4431 (fax)

ATTORNEYS FOR PLAINTIFF

12